May it please the Court, my name is Greg Wallace and I represent Angela Noerper in this Social Security Disability Appeal. The ALJ in this case found that Ms. Noerper can perform light work with no forceful gripping. Those are the two findings I want to focus on today in my argument. Now significantly if Ms. Noerper, who is 51 years old, is limited to sedentary work rather than light work, she would grid out as disabled under the medical vocational guidelines. So my argument today is that the ALJ's findings that she can perform light work and the findings that she is only limited to no forceful gripping are not supported by substantial evidence on the record as a whole, especially when you consider the evidence that detracts from those findings. Now as to her ability to stand and walk, light work requires the ability to be on your feet at least six hours out of a normal eight hour work day. Ms. Noerper has problems with her knees. She suffers from osteoarthritis as well as chondromalacia in both knees. That's a degeneration of the cartilage underneath the kneecap. Now the ALJ relied on two things to support his determination that she could do light work, which requires that standing and walking for six hours a day at least. First, he relied on x-rays from early 2015, which show mild degenerative arthritis. And second, he relied on purported normal examinations performed mainly by Dr. Wilkinson, Noerper's primary care physician. So let's look at the x-rays first. The x-rays, according to the ALJ, show only mild degenerative arthritis. Dr. Jones, who is Ms. Noerper's treating orthopedist, had a very different view of that. He, in his notes, said that the x-rays showed osteoarthritis, a narrowing of the joint space, a bone spur, chondrocalcinosis, ligament strain, and multiple tendinopathies. Now that is a far cry from simply mild degenerative arthritis. But even more importantly, nine days before Ms. Noerper had those x-rays in early 2015, she underwent an MRI of her left knee. And that MRI showed marked chondromalacia, marked thinning of the patellar cartridge, and a deep cartridge fissure. Now the commissioner in her brief describes these as some abnormalities. I think that that is a mischaracterization of this kind of marked problems that she has with her knee. And when you look at both Dr. Jones's interpretation of the x-ray as an orthopedic specialist who is treating her, and when you consider the MRI of her knee in the same month that these x-rays were taken, the x-rays standing alone simply do not constitute substantial evidence. Now the second thing the ALJ relied on here was, suppose, normal examinations. Now we've explained in our brief how many of the findings the ALJ relied on were really not diagnostic of the kinds of impairments, the osteoarthritis and chondromalacia that Ms. Noerper suffers from. They also were performed by, these examinations that the ALJ relied on were performed by Dr. Jones, which is her primary care provider. The ALJ did not properly consider, however, the examination findings by Dr. Jones, the orthopedic specialist. Wasn't one of the significant differences the number of times those doctors saw her? In terms of the PCP versus her orthopedic surgeon, yes. But part of the thing is that typically these primary care doctors, particularly in this case Dr. Wilkinson, who referred her to Dr. Jones, they typically, once these kinds of conditions are referred to another specialist, they typically don't pay very close attention to that. And I think that's one of the things that, for example, as we point out in our brief, Dr. Jones' findings, which he found significant limitations in her range of motions with crepitus and pain. He found tenderness, swelling, and even limited strength in her knees. His findings constitute 23 lines of narrative, in his opinion, involving more than 300 words. Compare that with Dr. Wilkinson's findings, which amount to only 60 words. So the more thorough examinations, even if Dr. Wilkinson's might have been more frequent, there might have been more, the more thorough evaluations came from Dr. Jones, the treating orthopedic specialist. And the LJ never explained why he should prefer Dr. Wilkinson's observations over that of the treating specialist. In fact, the ALJ deals with Dr. Jones' findings in a single sentence in his opinion. So we have both objective evidence, the MRI, Dr. Jones' interpretation of the x-rays, as well as the clinical examination by a specialist that all contradict the ALJ's finding about the severity of Ms. Norper's knee problems here. And with her knee problems, she simply cannot engage in the prolonged standing and walking that's required for light work. I think she twisted her knee or had a knee injury at some point. How does that play into the analysis in terms of the timing on who examined her and when? I'm not sure that that has any relevance to that simply because the findings were what they were at the time. So I'm not sure. The reason why I'm asking is twisting your knee or hurting your knee in an acute fashion may not have the long-term effects that some of the other things that you suffer from. But the x-ray evidence of osteoarthritis and the MRI evidence of this marked disintegration of the cartridge underneath her kneecap are conditions that really are not due to injury. They're degenerative-type conditions that occur over a long period of time in that regard. Just a word about the fingering and handling. The ALJ said only no forceful gripping. And he relied on supposed normal neurologic findings, a good response to injections, and a lack of a nerve conduction study. But Dr. Maynard, again, who was treating her for carpal tunnel syndrome, repeatedly found a positive Phalen signs bilaterally. He gave her multiple injections. X-rays, two x-rays, one in February 2015 and one in January 2016, both show severe osteoarthritis in her left hand. So are you suggesting the injections worked for some symptoms but not others? I understood that the injections were very successful for her. They provided, at best, temporary relief. And certainly those injections, while they might have helped her carpal tunnel syndrome, they certainly did not cure her severe osteoarthritis in her hand. Dr. Jung, who was one of the state agency doctors, gave the opinion that she should avoid frequent, gross manipulation with her hands. And the ALJ rejected that. Again, given his opinion, given the x-ray showing severe osteoarthritis, and giving Dr. Maynard's treatment of her, again, those things contradict the evidence the ALJ relied on to find that she was limited only from forceful grip. I read the record the same way that Judge Kelly does, which is that, and I agree with you, injections don't normally cure arthritis, but they do relieve the pain associated and function in a more normal manner. So I guess I would repeat the question, didn't that provide support for the ALJ's decision, at least on the hand? There was nothing in Dr. Maynard's notes which indicate that these injections were successful in putting her in a position where she can do the frequent fingering and handling that's required under the ALJ's RFC assessment. Thank you, Your Honor. Thank you. Excuse me. May it please the Court. My name is Angela Thornton-Millard, and I represent the Commissioner. The issue in this case is whether the RFC is supported by substantial evidence. And substantial evidence, as the Supreme Court has recently reiterated, is evidence that a reasonable mind might accept as adequate to support a conclusion, or as this Court has stated, is the ALJ's decision within the zone of choice. And in this case, the RFC for light work and no forceful, repetitive gripping is supported by substantial evidence. Plaintiff was 45 years old on her alleged onset date. She had passed relevant work as a carnival worker, unskilled work, and she was involved in an accident in 2009, a year before she alleged her disability began. Then there's a four-year gap in treatment until she sought treatment in April 2013 for plantar fasciitis. And that treatment is not really an issue. It appears it was fairly successful to treat her. Well, let me ask this. Is there an issue in this case as to whether the record is fully developed? I look at the orthopedist report, and the ALJ did not dispute that report, and it's a treating physician, so I think they carry significant weight.  But how do we determine, based upon that report or anything else in the record, whether or not she can stand for six to eight hours a day? The orthopedist doesn't say. How do we make that leap from the medical evidence that is in the record to six to eight hours? That's always the question in these cases, Your Honor. There is no specific requirement. We don't have to have a medical opinion telling us exactly how many hours she can stand or walk. I think in this case, regarding that specific issue, she repeatedly was noted to have a normal gait. She was even saying towards the end of the records that her knee pain was improving with the injections and her weight loss. Her examinations were unremarkable, and none of her physicians placed any restrictions on her ability to stand or walk throughout the day. So you're saying that the fact that there is no restriction allows the ALJ to make that assumption that she can walk six to eight hours, stand and walk six to eight hours? That's one factor, I think, that has to be considered. That can be taken into account. With regard to her knees, she didn't start receiving treatment on those regularly until December 2014. Her primary care physician, the exams were fairly unremarkable. He treated her with non-steroidal anti-inflammatory medications. And then she did see Dr. Jones, the orthopedic specialist, in February 2015. And at that time, there was some swelling and some weakness, especially in the left leg. And Dr. Jones diagnosed an MCL sprain at that time. He gave her a brace so that that injury would heal and then recommended conservative treatment like physical therapy, water aerobics, weight loss, and continued anti-inflammatory medications. But Dr. Jones did find, based on his examination, that the knee was not working properly, right? It wasn't just an immediate concern about an injury, was it? I believe you're correct, Your Honor. No one's questioning that she has degenerative issues in her knees. So why shouldn't the ALJ have given, if not given, Dr. Jones more weight in the decision, at least given a reason why the expert would not be given more weight in the ultimate decision? Well, I don't think that the ALJ discounted Dr. Jones's examination. Perhaps it would have been nice if he would have discussed it more, but that's not the standard. And in my review of the record, I was not able to find any additional treatment notes from Dr. Jones had she come back to him or was there improvement in her functioning after the MCL sprain healed. So, and I think it's important to note what another thing Dr. Jones did say was that he was actually concerned that she was seeking disability at such a young age, indicating maybe he thought she could perform more, she could do some type of work or some type of activities. With regard to plaintiff's carpal tunnel syndrome, it's been noted, she repeatedly stated that the injections helped her hands to feel better. There was the reduced grip strength that that was a finding in the record and the ALJ reasonably accounted for that in finding she could not perform repetitive, forceful gripping. But no additional limitations are required. In fact, after she received the injections, she was asked to rest for a brief amount of time and then was able to return to normal activities. Her physician released her to return to normal activities. Is there anything in the record to indicate whether she could meet the gripping and pulling requirement without the injections? Not that I know of, your honor, no. And is there anything in the record as to whether there's any limitation on how often you can get these injections or the number? I mean, is this something, I don't know. I've had friends who've had injections for arthritis, but can you get them every three months ad infinitum or is there a limit or at some point do they quit working? I don't know. Is there anything in the record about that one way or the other? I don't believe so, your honor. All I know is that she did receive injections every several months and at that point they worked. Were they cortisone injections or were they something else? Do you know? They usually are, but I can't say for sure on this record. This is for my understanding of the record. What is a marker? What is the position, a job as a marker? I believe it has to do with putting prices or tags on retail items. And this is, I guess, marginally relevant, but how often are these job descriptions updated? Do you know? Unfortunately, the Dictionary of Occupational Titles has not been updated since, I believe, the early 1990s. Because a job as a marker seems a little outdated if you're putting little stickies as prices in this day and age. And that's why most of the time there's a vocational expert to talk about more recent trends in the jobs and what they're required. The question is not whether the ALJ could have found different limitations. The question is whether the ALJ reasonably accounted for plaintiff's severe impairments. Plaintiff is essentially asking the court to reweigh the evidence and come to a different conclusion. But as long as the ALJ's decision falls within that zone of choice, it should be affirmed. Substantial evidence supports the RFC for a range of simple, light work and no repetitive, forceful gripping, and the commissioner respectfully requests the court affirm the ALJ's Thank you. Thank you. May it please the court, very quickly, I agree with you, Judge Malloy, that there needs to be more evidence here in this case. In Shontos, this court said that an ALJ cannot draw his own inferences from the medical evidence. And the fact that these doctors did not place restrictions on her hate fires, Hutzel, and the Lauer cases, when a doctor is not asked to assess the claimant's ability to work, his or her silence on the question cannot be used as substantial evidence that the claimant is disabled. Thank you, Your Honor. Thank you. Thank you both for your argument and your briefing.